UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

         v.                        23 CR 72 (RMB)

MARK O'MARA,

                             Supervised Release Hearing
                                   (Teams)

            Defendant.

------------------------------x

                               New York, N.Y.
                               December 19, 2024
                               12:00 p.m.

Before:

                  HON. RICHARD M. BERMAN,

                            District Judge

                     APPEARANCES

EDWARD Y. KIM
    United States Attorney for the
    Southern District of New York
BY: JANE KIM
    Assistant United States Attorney

SAMSON ENZER
    Attorney for Defendant

ALSO PRESENT
    KAREN ROSERO, USPO (SDNY)
    ANGEL CAULA, Counselor

(The Court and all parties appearing via Teams)

DEPUTY CLERK:  Judge, on the telephone, we have Mr. O'Mara's treatment provider, Angel Caula.  We have Probation Officer Karen Rosero.  We also have defense counsel Samson Enzer, and Mr. O'Mara.  And we have AUSA Jane Kim.

Judge Berman, we're ready to proceed.

THE COURT:  Good morning, everybody.  How are you?

MR. ENZER:  Good morning, your Honor.

MS. KIM:  Good morning.

MR. CAULA:  Good morning.

THE COURT:  Let me just check my notes.  I have been over them already, and there have been some issues that have come up that we need to deal with.

Our last hearing was October 29, 2024, I believe.  We will make the transcript of that proceeding Court Exhibit A in today's proceeding.  Everybody seemed to agree that this session should be or could be virtual and so it is.  One principal issue that I wanted to raise is this:  We had discussion a few times about termination early of probation, and I think it was my own thought that if there is going to be early termination that if things continue do go well, we would end probation on or about December 31 of this year.  Now let me just clear the air for one thing.

Counsel I think had written to me a letter about, in effect, some sort of endorsement of Mr. O'Mara in terms of his

future.  That is not something that I think is appropriate.  I don't do letters of reference or support.  I don't see it as my job to do as a judge.  So I am delighted when people terminate early because that means that they have been doing what they have been asked to do, and it's in the public interest typically to have an early termination.  It strikes me that probation here started November 29, 2023 for a period of two and a half years and is scheduled to end on May 28, 2026.

And as things have been progressing and seem to have been going quite well, I said, and I feel that it is appropriate that we could terminate probation early with this caveat:  So my practice in early termination is not only that the person who is on probation or supervised release, for example, is doing well; meaning, that they're doing everything that was asked of them or required of them at the beginning of supervision or probation, as the case may be, and there have been no violations, but most important is that there has been, in my practice, unanimity from the team that has been assembled to be of help to the person, in this case Mr. O'Mara, but in any instance of supervision, I look to the team to see if they are in agreement with early termination.  That's number one.

Number two -- or it should be the other way around, I guess.  I was anticipating from our conversations that the probation department would submit -- if probation, as I think they do, feels that Mr. O'Mara has been doing well, I was

anticipating that there would be a written application for early termination. Unless I missed something, I don't think I got that yet, and that is important. It's important because in our experience, in my experience of supervised release, which is similar in some respects to probation, we always get over 90 percent of unanimity. And one way I get that is through the vehicle of an application.

So question number one is, did probation -- has probation presented or thought to present an application for early termination?

MS. ROSERO: Yes, an early termination report for Mr. O'Mara has been completed. I did not submit it to the Court. I was waiting on whether the Court wanted it submitted today or later after the procedure. I apologize.

THE COURT: Could you tell us what it said in the positive?

MS. ROSERO: Yes, your Honor.

THE COURT: And have you canvassed everybody else? So, Jane, for example, anybody else who is an interested player, so to speak, in this scenario, have they agreed also that early termination is appropriate?

MS. ROSERO: Yes, your Honor. So I did reach out to the AUSA, and their office does not take a position on early termination.

THE COURT: It doesn't oppose it, but doesn't -- is

not taking a position or sometimes they defer to probation. I'm not sure. But we'll hear from Jane in a couple of minutes. Anyway, that's the background. So.

Why don't we start with probation and hear people's response to early termination, and then if you want to go into detail because I know that the government has opposed the idea of the Court issuing an order with respect to, I don't know, Mr. O'Mara.

But, anyway, let's start first with the basis for an early termination. And if it is going to happen, it would be effective December 31, 2024. And let's hear from probation on that subject.

MS. ROSERO: Yes, your Honor. Probation does not disagree with early termination for Mr. O'Mara. Mr. O'Mara has adjusted extremely well to supervision. He has been extremely motivated since commencing supervision. He has paid off all his restitution, his fines, and his forfeiture, and he continues to remain ambitious to getting employment.

THE COURT: And is that something he's pursuing or has pursued already?

MS. ROSERO: Yes.

THE COURT: In other words, that's in progress?

MS. ROSERO: Your Honor, my understanding from Mr. O'Mara that he had a bunch of job interviews. He also had a second job interview for a position in Atlanta. I'm not sure

if he got the position with them.  I know he was waiting to hear back.

THE COURT:  Okay.

And, Jane, what's your viewpoint, viewpoint?  I heard or I hear that you -- the government is not taking a position, but still, substantively, you don't have any quarrel that Mr. O'Mara has done a good job with probation?

MS. KIM:  Yes, your Honor.  So we -- I think it's undisputed that Mr. O'Mara has been in full compliance with the terms of his supervision, and has had the benefit of these appearances before the Court.  Our office typically does not take a position on early termination when it is based on full compliance with terms of supervision, just because of the law on that, but you are correct that we don't take a position, which includes that we don't oppose.

THE COURT:  I see.  Okay.  And so when -- I'm happy to take that application today or tomorrow, whatever -- or whenever it's ready, I'll take a look at it.  And if it's in the shape that I anticipate it will be, you know, I will sign it, and it will be effective early termination effective December 31, 2024 -- oh, wait.  I did say that.  I'm looking at my notes.  I said explicitly that then effective December 31, 2024.  So that would mean a shortening of probation of some, what, five months or something like that?  It's fairly significant early termination.  So when would that be available

for me to see and sign?

MS. ROSERO:  I can have it over to you first thing tomorrow morning.

THE COURT: Okay.  All right.  Fair enough.  So let's see what about Mr. O'Mara?  I'm curious to hear from you, how your experience with probation went, whether you feel it was done professionally and, in particular, helpful from your point of view or any suggestions that it could be different or done better or whatever.  I'm asking this and saying this as if it is the reality that this would be the last hearing.

THE DEFENDANT:  Thank you, your Honor.  First and foremost, thank you for the opportunity to terminate probation early.  It really is a huge relief on myself and my family and really creates a strong foothold for me to propel into a meaningful and productive future.  I just again want to say thank you, and I'm really appreciative of it.  It means a lot to me and my family.

I know that you don't have to have these updates, and I hear that many judges don't, but I think that that has been the most encouraging and perhaps effective part of this probation process is your genuine, what I feel to be genuine caring about the probation process and the supervision process, and the meaning that your presence and, you know, constant reiteration and supervision means.  I found it to be extremely helpful and extremely meaningful, and I encourage, you know,

other judges or other individuals in my position that that would be a meaningful benefit to them, you know, your position on trying to get the USPO to help obtain or at least apply for a certificate of relief from disabilities should be a meaningful step for me in the future as well.  So, from a probation process standpoint, that is absolutely the most meaningful and beneficial piece, so I thank you for that as well.

I think, like many things, the probation process is what you put into it.  You get out what you put in.  And I from the very beginning believed that I took pretty aggressive and extraordinary kind of steps.  I paid everything off as expeditiously as I could.  I completed the public service, not only expeditiously, I think I did 290 instead of the 250 hours within six months of starting or some other rapid pace.  Not only that, I received letters from the individuals I supported calling my work transformative and actually increasing the popularity of the aging center at Harlem which I supported.

So, again, I really think I put my full weight and effort behind the rehabilitation and the supervision process, and that is why I feel that there was meaningful change coming out of it in my benefit.

I think the same goes for the therapy.  I did not miss a session.  Not only did I just attend and participate, but I believe Angel would agree that I was kind of a vigorous

participant really trying to get out everything that I could from the benefits that were offered to me throughout the supervision process.

So I hope that answers your question. I'm happy to answer any additional. But, again, just want to say thank you for the opportunity.

THE COURT: You're very welcome. And no, I think you stated it eloquently, so to speak, and so I think you did do service to the public. And how did the process -- how did it impact yourself, if you care to share.

THE DEFENDANT: Yeah. Sure. I've actually done community service my entire life. It's always been a meaningful part of who I am, but specifically during the probation period because I had so much time, you know, there was an ability for me to really touch individuals on a meaningful level. So first at the Habitat for Humanity, I would do many things like helping families that are experiencing, you know, they're unhoused or they're experiencing some sort of, you know, financial difficulty that's impacting their daily life, and we were able to provide them with either free or at a deep discount equipment and materials and things for the home ranging from televisions, refrigerators, microwaves, ovens, sinks and bathtubs to desks and computer systems for them to work remotely and have that ability. So, you know, there were many individuals that I made

meaningful connections with during that process, as well as the individuals I volunteered with and worked with through that process.

But I would say more so with the second endeavor, and that was supporting it's called ARC XVI. It's a funded non-profit organization funded by the Department of Aging with the City in Central Harlem. So in that role I played many different kind of roles of responsibilities. And I would do everything from greet people when they came in in the morning to pick up the phone to call members who haven't been there for awhile to see how they were, how they're doing. I would sit down and play dominoes or bingo or ping-pong with the individuals. I would help them learn how to use a computer or just reading things in English and help them translate them to Spanish, and helping them access social services that are pretty commonplace to most of us.

In that way, I was credited with actually increasing the popularity of the program and really making kind of a meaningful improvement to the entire center. In fact, I think I submitted a letter to probation from the director of that center testifying to those realities. And the most impactful of that is just the individuals - it always has been and always will be - being able to improve somebody's day, somebody's life is really important to me, and having the opportunity through the probation process was extremely meaningful and beneficial.

And, lastly, your Honor, I would just like to thank the team. You know, I know that, you know, Karen and Officer Rosero, sorry, and Angel, my therapist, and the AUSA, they obviously have been instrumental in not only attending these meetings but answering my questions and supporting my application requests, so I just want to thank the team as well.

THE COURT: I'm glad you did that and said that because my own feeling is that it is the team that we put together or that is together in support of people who are on supervision or on probation and whose only goal is to make your reentry -- one's reentry into the community safely and successfully. And they are really topnotch, all of them. And that is the service providers, to be sure, but also the Assistant U.S. Attorney, to be sure, and everybody else. So I think this is a team effort, and I think it works very well.

Christine, do we have a service provider on this call who I overlooked?

DEPUTY CLERK: Yes, the therapist Angel Caula on the telephone.

THE COURT: I don't see it on my -- anyway, can we hear from Angel?

MR. CAULA: Yes, your Honor. I will say that.

THE COURT: I see. There you are.

MR. CAULA: In all the 31 years that I have worked at the St. Mark's Institute for Mental Health, I seldom have had a

client like Mr. O'Mara, probably because his education and background is very good. He has made good use of the therapeutic sessions. He didn't miss one or was never late to any one of them. He certainly worked on the stress levels that he had and depression associated with society. And he has been one of the best clients I have ever had at the agency.

THE DEFENDANT: Thank you, Angel.

THE COURT: And how do you feel? I'm on a panel I think in January that talks about the importance of mental health in supervision and probation. My own personal point of view is that it is actually indispensable. What's your take about that, the role of mental health counseling, for example?

MR. CAULA: I mean, my personal opinion?

THE COURT: Yes.

MR. CAULA: Yes. Well, it's -- it's a paramount role. I mean, most of the clients assigned to us come to us very depressed, anxious, frustrated, and it, you know, or as you provide the services, they have access to psychiatric services or medication if they need it. But not in this case. This case has been sort of different, but the mental health service is very important that we have in this these kind of legal situations.

THE COURT: Have you worked with people on supervision before, supervised release in particular and/or probation in other instances?

MR. CAULA: Yes. Ever since the agency accepted a contract from probation, we have actually worked -- I have actually worked with many probation officers' clients, and I certainly think Ms. Rosero has always been available to me, and we consider her to be part of the team at the St. Mark's Institute for Mental Health.

THE COURT: Well, good. I think then that it -- then I will lay out the timeframe.

Karen, by the way, did you want to add anything?

MS. ROSERO: No, your Honor. Thank you.

THE COURT: So the way it sounds to me, I'm going to get an application from probation tomorrow. I'll take a look at it. I'm sure it's going to be positive, and I'll be happy to sign it, and we will post it on the docket, and then we are done.

When I say we're done, we wish Mr. O'Mara all of the best of luck going forward. By the way, as far as I can tell, you aren't going to have any trouble in the workplace or whatever kind of position you've lined up, that would be my guess. But at the end of the day, I wish you all the best of luck.

MR. ENZER: Thank you, your Honor. One thing before we wrap up.

THE COURT: Okay.

MR. ENZER: Not to take a way from those remarks, but

Mr. O'Mara has travel. He has planned travel for the holidays to see his wife's family and his family in Pennsylvania and Ohio, supposedly today, this is the same as his travel last year. I believe he's asked probation for permission, and I think we would just appreciate guidance either from probation or the Court on whether he can go.

MS. ROSERO: I do not have any objection.

THE COURT: Yeah, and neither do I, so we get that issue off the table. And, again, we wish you all the best of luck, and we will send you any paper material that may come to my desk with respect to your termination. Okay?

MR. CAULA: Your Honor, if I may add one thing?

THE COURT: Yes.

MR. CAULA: Mr. O'Mara and myself already have talked about his vacation time, and he has two more sessions with me, and we are going to do the session via phone or telehealth while he's on vacation.

THE COURT: No problem. That's no problem. I think it's a good idea.

MR. CAULA: Thank you, your Honor.

THE COURT: Jane, anything you wanted to add?

MS. KIM: No, not from the government. Happy holidays to everyone.

THE COURT: Yep. Thanks so much. Great to see you all. Thanks everybody.

MR. CAULA:  Nice talking with you, sir.  Bye-bye. Happy holidays everybody.

THE COURT:  You too.

(Adjourned)